Christian, J.
delivered the opinion of the court.
The single question presented for our consideration, is whether, under the circumstances of the case, a commissioner, who, under the direction cf the court, collects and disburses Confederate money, and by order of the court retains the balance which is in controversy between disputing lien holders, until the rights of the parties are litigated, can be held personally liable for any loss that may be incurred in consequence of the fund perishing on his hands, by the result of the late civil war.
The appellant, as the commissioner of the court, sold the tract of land in the bill and proceedings mentioned, on the 22nd May 1860, for the sum of $11,500, and took from the purchaser three bonds, payable respectively at twelve, eighteen and twenty-four months. This sale was confirmed by the court at its April term 1861, when the court made an order directing the said commissioner “ to collect the purchase money for said land as it falls due, and report his proceedings to this court from time to time for its further order,” &c.
After the April term 1861, there were no regular courts held in the county of Smythe until 1863, owing to the disturbed condition of the country consequent upon the breaking out of the late civil war. Ho Circuit court was held between April term 1861, and April term 1863, the judge of that court being in command of a regiment in the service of the Confederate States, and was killed in battle.
At the April term, 1863, the commissioner made his *198 report, by which it appeared that in accordance with the direction of the court he had proceeded to collect the purchase money, and paid out to the parties entitled thereto the sum of $7,422.00, leaving a balance in his hands of $3,847.04, which last named sum he reported to be “on deposit in the Abingdon bank, subject to such orders as the court may make.”
Upon the coming in of this report, to which there was. no exception, the court on the 6th of April 186B entered the following decree: “Jos. W. Davis, trustee and commissioner appointed to sell the land of Jezreel Harman, under decree in this court, filed his report showing a balance in his hands of the proceeds of the sale, of $3,847.04, after paying the amount in full of Peter G. Snavely, deed of trust, and to Vincent S. Morgan the sum of three thousand dollars, the date of which payment is not stated, &e., &c., and it appearing by a statement filed in the case, that there is a balance in the hands of said Commissioner Davis of $925.62, after paying all' contested liens asserted against the fund ; it is adjudged, ordered, and decreed, that the said Jos. "W. Davis pay to the complainant or her attorney, out of said balance, the sum of eight hundred dollars on account of her decree ; the court reserving the adjudication hereafter, of said contested liens asserted by V. S. Morgan, John B. Straw, and Thomas M. Tate.”
The decree, though not formally confirming the report of Commissioner Davis, did in effect adopt and confirm it, There was no exception to said report, and the decree above referred . to was evidently based upon it; and all the directions of that decree are based upon the hypothesis that the report of the commissioner was free from objection ; and it was thus in fact, though not in form, adopted and confirmed by the decree.
It appears from the record that no other decree was rendered in the cause until after the close of the war, to wit: on' the 28th of March 1866. On the 25th March *199 1866, the commissioner, Jos. "W. Davis, filed his report showing that after performing the decree of the 3d of April, and paying certain .Confederate taxes, there remained in his hands a balance of $1,208.88, in Coufederate money. He further reports that he had collected the whole proceeds of the sale of land ($11,269.04,) in Confederate money, (which he had paid out to the parties entitled, in the same currency, none of them objecting to receiving it,) leaving the above balance in his hands subject to the order of the court; that he was ready and anxious to pay over the balance in his hands at the date of the last decree, (April ’63,) but there being a contest am on g=t the creditors of Harman, under contested liens claimed by them, the court reserved the adjudication of these claims, and thereby prevented him from paying over said balance, it not being ascertained to whom it should be paid; that he kept this fund in bank at Abiugdon ready to meet the order of the court, until he was compelled, under then existing law's, to vest the fund in four per cent. Confederate certificates, which he still holds subject to the order of the court.
On the 27th March, the appellee filed an exception to this report, to the effect, that the commissioner was not authorized by any decree or order of the court, to receive Confederate money from the purchaser of the land, or to invest it. This exception was sustained by the Circuit court, and by its decree entered on the 22d November 1870, it was decreed and ordered that the appellant pay the sum of $1,208 48 with interest from the date of this decree. It is from this decree that an appeal is allowed to this court.
We are of opinion, that according to the well settled principles of courts of equity respecting the liability of trustees and other fiduciaries, where no mala fides can he imputed, this decree w’as manifestly erroneous. "While the acts and omissions for w'hich a trustee will be held responsible for violations of the trust reposed, *200 have not been classified or defined by the courts with such accuracy and precision a3 to furnish a rule -without exception to be applied to the great variety of cases which grow out of this fruitful source of equity jurisprudence, yet it is easy to extract from the cases and the opinions of learned jurists and text writers, certain general rules which seem now to be universally recognized and established. One of these general rules is this, that nothing more should be required of a trustee than that he should act in good faith and with the same prudence and discretion that a prudent man is accustomed to exercise in the management of his own affairs. Elliott v. Carter & als. 9 Gratt. 541, 559, 560; Taylor & als. v. Benham, 5 How. U. S. R. 233. In Knight v. Earl of Plimouth, 3 Atk. R. 480; S. C. 1 Dickens’ R. 124, 126, Lord Hardwicke said : “If there is no mala fides, nothing wrongful, in the conduct of the trustee, the court will always favor him. Eor as a trust is an office necessary between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept it. To add hazard or risk to that trouble, and to subject a trustee to losses he could not foresee, would be a manifest hardship, and would be deterring every one from accepting so necessary an office.”
In Thompson v. Brown, 4 Johns. Ch. R. 619, 628, Chancellor Kent expresses his concurrence in these views; and he declares that where there is no just imputation of mala fides, and the fault is but at most an error of judgment and a want of sharp-sighted vigilance, it would have the appearance of great rigor and be hardly reconcilable with the doctrines of a court of equity to hold a trustree responsible. See also Hart v. Ten Eyck, 2 Johns. Ch. R. 62.
The cases of Wilkinson v. Stafford, 1 Ves. Jr. R. 32, and Vezo v. Emery, 5 Ves.R.141, also strongly support theproposition that trustees acting with reasonable care and pru *201 dence, and with the best judgment they can form upon the occasion, will be protected, notwithstanding the unforseen loss of the trust subj ect. See also Powell v. Evans, 5 Ves. R. 439, in which the master of the rolls says that the court should act with great tenderness towards trustees, wrho are-called upon often to execute onerous and difficult trusts, and are entitled to great indulgence unless neglect be fully proved. In the case of Taylor & als. v. Benham, 5 How. U. S. R. 233, the court uses the following language : * ‘ Persons acting in a fiduciary capacity stand in the same position as it regards liability for the property intrusted to their care, with bailees aud agents generally, and are only answerable for actual or constructive negligence, or wilful misconduct. They are not, therefore, responsible for a loss unless it has been occasioned by their own wrong, or when they are in default for no't having interfered to prevent it.” Many other cases and opinions of learned judges might be cited tending to the same conclusion; and in the language of Judge Lee, delivering the opinion of the court in Elliott v. Carter & als., 9 Gratt. 559, “the fair result of the views which they present, and the reasoning they adopt, is, that where a trustee has acted in good faith in the exercise of a fair discretion, and in the same manner in which he probably would have acted if the subject had been his own property and not held in trust, he ought not to be held responsible for any losses accruing in the management of the trust funds. It is doubtful whether a wise policy should ever require more of a trustee than that he should act in good faith, and with the same prudence and discretion that he is accustomed to exercise in the management of his own affairs.
Applying these principles of equitable jurisprudence to the case before us, we are constrained to say, that Davis, the trustee and commissioner of the court, ought not to be held responsible because the Confederate money which the court, 'by its decree, left in his hands, has perished, *202 before it could be distributed by tbe court. In this case, there is not the slightest ground to impute to him anything like mala fides in the transaction now called in question. The amount which he collected was in Confederate money. When the bonds fell due it was notorious that there was no other currency in circulation. When he made his report to the April term 1863, the court knew and the parties knew that the balance reported in-his hands was Confederate money. It is proved that the payments amounting to upwards of seven thousand dollars, were made in Confederate currency, and was received without objection by the parties entitled to receive it. The party now seeking to hold him responsible had filed his petition in the cause asking for his proportion of the fund iu the hands of the trustee, knowing that it was Confederate money. And it would have then been paid but for the fact that his claim was not then adjudicated, but expressly reserved for further adjudication of disputed liens with other claimants.
The effect of the decree of the 6th of April 1863, was to direct the appellant to hold the fund until called for by the court. That such wjas the effect of that decree is recognized by the court in the decree of 22d November 1870, which is the decree appealed from, where the court says he is not chargeable “with interest prior to this time, because he toas ordered, to hold the fund to aioait the decision of this court,” ¿fe. Suppose be had kept the money in his pocket or in an iron safe in his own house or at his place of business, and it had remained there until the collapse of the Confederacy, when its currency perished ; could it be maintained, that he ought to be held responsible to make that good, which, without any default of bis, had become worthless trash by the fate of war. What boots it that he deposited it in bank instead of keeping it in his pocket or his iron chest ? Does that cMnge the case so as to affect his liability. The fund was left in his hands by the court to be held by him *203 until called for to be distributed. He deposited it in bank. It was certainly more safe there, especially in a time of war when raiders and marauders were harrying the country, than it would have been, kept about his person or in his house. This was certainly not an act for which he ought to be censured. It was rather an act of prudence ánd forethought on his part. But the court was informed by his report that the fund was deposited in the bank at Abingdon ; and the court directed no other disposition to be made of it. It is shown by the proof in the cause, that he never drew out a dollar except to pay to parties to the cause, upon the order of the court. He never appropriated a dollar of the fund to his own use, but kept it in bank until by the laws of the Confederate states he was compelled to fund it. It is true it was deposited in his own name. And it is argued by the learned counsel for the appellee, that as the fund was not deposited to the credit of the cause, but was mixed with his own funds, therefore, he must be held l’esponsible for the loss. We would not be understood as at all disputing the. authority of the cases relied upon to show, that "\vhere a trustee deposits the trust fund with a banker, or in .a bunk, and does not separate it from his own funds by designating it as the trust fund, and a loss occurs in consequence of such deposit, that loss must fall on the trustee; as for instance, where the bank fails, or the banker becomes insolvent. But in this case these authorities have no application. The loss here was not in consequen.ee of the deposit.
It was not the failing of a bank, or the insolvency of a banker, but it was the sudden and irretrievable destruction of the whole currency of a country, by the termination of a civil war which had destroyed the very power that created it. The thing deposited for safe keeping, which was the thing received, to wit : Confederate money, had perished without any default, any where, but had perished with the overthrow of the government *204 which had spoken it into existence. Neither the authorkies relied upon, nor the reason upon which they are ' founded, can have any application to a case like this, It would be too rigorous and too unjust; it would be in violation of those well settled principles, founded in reason and in conscience, which control the action of courts of equity, to hold that though the appellant has been guilty of no mala files, no misconduct, no negligence, yet he is to be held responsible for a loss which he had no part in creating and no power to prevent. JBut that loss, we think, ought to fall upon those who were entitled to the fund that has perished.
We are, therefore, of opinion that the decree of the Circuit court of Smythe county must be reversed.
The decree was as follows:
The court is of opinion, that the said decree of the said Circuit court is erroneous; therefore it is decreed and ordered that the said decree bo reversed and annulled, and that the appellant recover of the appellee, Tate, his costs about his appeal in this behalf expended; and this court proceeding to render such decree in the premises as the said Circuit court ought to have rendered, it is further decreed and ordered that the exceptions of said Thomas M. Tate, by his counsel, to the report of said Joseph W. Davis as commissioner, filed 26th March 1866, be overruled, and that 'the said report be confirmed, and the cause remanded to said Circuit court of Smythe couuty for further proceedings.
Decree reversed.